IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF NATALYA R. & O'SHEA R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF NATALYA R. & O'SHEA R., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SHANE R., APPELLANT.

Filed March 7, 2023.    Nos. A-22-451 and A-22-452.

Appeals from the County Court for Lincoln County: JOEL B. JAY, Judge. Affirmed.

Chevas Shaw, of Shaw Law, L.L.C., for appellant.

Rebecca Harling, Lincoln County Attorney, and Angela Franz for appellee State of Nebraska.

Margaret R. Jackson, of Brouillette, Dugan, Troshynski & Bellew, guardian ad litem.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

### INTRODUCTION

In these consolidated appeals, Shane R. appeals from the decisions of the county court for Lincoln County, sitting as a juvenile court, terminating his parental rights to his children, Natalya R. (case No. A-22-451) and O'Shea R. (case No. A-22-452). We affirm.

BACKGROUND

Shane is the biological father of Natalya, born in 2005, and O'Shea, born in 2009. Kizzie R. is the children's biological mother. The children's guardian ad litem (GAL) sought to terminate Kizzie's parental rights to the children in these same juvenile proceedings below, however Kizzie ultimately relinquished her parental rights to the children. Because Kizzie is not part of this appeal, she will not be discussed further. We note that Shane has another child, Afiniti R., with his ex-wife, Jodi R., and Jodi sought to have Shane's parental rights to Afiniti terminated in a separate proceeding; his parental rights to Afiniti were ultimately terminated. Our opinion affirming the termination of Shane's parental rights to Afiniti was released the same day as our opinion in the current case. See *In re Interest of Afiniti R.*, No. A-22-453 (Neb. App. Mar. 7, 2023) (selected for posting to court website). Because neither Afiniti nor Jodi are part of this current appeal, they will not be discussed further.

Natalya and O'Shea were removed from Shane's care on February 12, 2021, because of concerns about drug use in the home and neglect of the children.

On February 12, 2021, the State filed petitions in the juvenile court alleging that Natalya and O'Shea were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they were in a situation dangerous to life or limb or injurious to their health or morals. The juvenile court entered a detention order that same day placing Natalya and O'Shea in the temporary custody of the Nebraska Department of Health and Human Services (DHHS), ordering Shane to submit to wearing a drug patch, and ordering a hair follicle test for the children to test for exposure to controlled substances. Both children's hair follicle tests were positive for cannabinoids (Carboxy-THC and/or Native-THC), and O'Shea's test was also positive for amphetamines and methamphetamines. They have remained in the custody of DHHS and in foster care placement ever since.

On February 16, 2021, the juvenile court appointed counsel to represent Shane and a GAL for the children.

On March 2, 2021, the juvenile court ordered Shane to not possess or consume alcohol or any non-prescribed drugs and to undergo drug patch testing as a condition of visitation. Shane was ordered to submit to a chemical dependency evaluation, and he was also ordered to do a psychological evaluation and follow all recommendations of that evaluation.

After a contested adjudication hearing in June 2021, the juvenile court adjudicated Natalya and O'Shea to be children within the meaning of § 43-247(3)(a).

On July 9, 2021, the GAL filed a motion to suspend Shane's visitation with the children alleging that he failed to initiate or complete chemical dependency and psychological evaluations, his drug patches tested positive for methamphetamine for several months and he was not currently wearing a patch, and his continued use of methamphetamine was negatively affecting the visits. The GAL requested that Shane's visits be suspended until he complied with the court orders and made progress towards his substance use goal.

Following a disposition hearing on July 27, 2021, the juvenile court entered a journal entry and order adopting the DHHS case plan dated July 20, 2021. The DHHS case plan stated that Shane needed to have safe and stable drug-free housing, have legal and stable employment, have

relationships that were free from domestic violence, provide for his children's basic needs, work with family support to learn and demonstrate parenting skills, address and understand substance abuse and drug seeking behaviors and the effects of substance abuse on his children, comply with drug testing and test negative for all illegal substances, complete a substance abuse evaluation and follow all recommendations as outlined by his therapist, and attend counseling and treatment to address substance abuse as recommended. In a journal entry entered on August 24, 2021, the juvenile court also granted the GAL's motion to suspend Shane's visits.

On March 3, 2022, the GAL filed motions to terminate Shane's parental rights to Natalya and O'Shea pursuant to Neb. Rev. Stat. § 43-292(1), (2), (4), (6), and (7) (Reissue 2016). The motions alleged that: Shane abandoned the children for 6 months or more, immediately prior to the filing of the motions; Shane substantially and continuously or repeatedly neglected the children and refused to give the children necessary parental care and protection; Shane was unfit because of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct was seriously detrimental to the health, morals, or well-being of the children; reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a); the children had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Shane's parental rights was in the best interests of the children.

### TERMINATION HEARINGS

The termination hearing was held on April 1 and 15, 2022. Shane failed to appear on April 1, but he was represented by counsel who did appear; counsel's motion to continue was denied. Shane appeared with counsel on April 15. The State called six witnesses. Shane testified in his own behalf, and he also called his adult daughter as a witness. Numerous exhibits were received into evidence. A summary of the relevant evidence follows.

Morgan Smith testified that he was the DHHS caseworker for Natalya and O'Shea in a previous juvenile case from the time they came into care in December 2018 until that case was dismissed on October 28 or 29, 2020. Smith was assigned to their current case from March 12, 2021, until January 24, 2022.

Smith testified that in the previous case, Natalya and O'Shea were removed from Shane's home in December 2018 because there were concerns the children were not being fed or getting to school, O'Shea had bruises on his body caused by Shane, and O'Shea had significant behavior issues. Shane was "involved very minimally or he was completely absent" from the case until 2020. Toward the end of the case, Shane participated in court ordered drug testing, and after three negative drug patches was able to have supervised visitation with the children. The children were eventually returned to Shane's care on October 28 or 29, 2020, when the case was dismissed. When asked why the children were returned to Shane, Smith stated that "there had been multiple discussions in regards to consistency with stability for the children and what that would look like" because the children had been placed with a distant maternal relative who had been allowing Shane to have contact with the children unbeknownst to DHHS; "so it had been discussed that if we were to do adoption or guardianship, contact with Shane would continue [and maybe even placement with Shane] . . . and that would be unsafe for the kids" and "he would interrupt the stability of their lives moving forward."

Smith testified that Natalya and O'Shea were again removed from Shane's home in the current case on February 12, 2021, less than 4 months after the previous juvenile case was dismissed. In the current case, the children were removed by law enforcement due to concerns of Shane's paranoid behaviors and substance use, as well as his educational and physical neglect of the children. The children underwent hair follicle testing and both children tested positive for THC, and O'Shea also tested positive for amphetamines and methamphetamines. Drug patch testing was ordered for Shane, who first put on a patch at the end of February or the first part of March and his last result was in June.

Mark Leach, a supervisor at Guardian Light Family Services, reviewed the agency's records regarding this case. Family support workers from the agency placed drug patches on Shane for a few months until his last patch in June 2021. Exhibit 19 contains the results from Shane's seven drug patches collected from March 22 to June 7, 2021, all of which were positive for methamphetamine and amphetamine.

According to Smith, Natalya and O'Shea had supervised visitation with Shane 10 to 15 hours each week. From the reports that Smith received, Shane was often described as being unprepared or falling asleep during visits; Shane had to be directed multiple times and awakened in order to be attentive and interact with the children and thus there was a concern that Shane's drug use was having an effect on his visits. Per DHHS policy, visitation stopped at the end of June 2021 because Shane had an active warrant for his arrest. After June, Shane had no more in-person contact with the children. He did have some video visits (supervised by the foster mother) and wrote letters to the children.

Theresa Feldman is a licensed independent mental health practitioner and a licensed alcohol and drug counselor. Feldman testified that she had been counseling Natalya and O'Shea since early 2021 and was seeing them weekly at the time of the termination hearing.

Feldman stated that at the time of her initial assessment, she diagnosed Natalya with PTSD, major depression, and anxiety; she was also having panic attacks, had low self-esteem, was not attending school, and was having nightmares. Prior to foster placement Natalya also smoked marijuana and cigarettes. Natalya also underwent a psychological evaluation with Dr. Gage Stermensky in October 2021 that Feldman relied upon in her treatment of Natalya; the psychological evaluation was received into evidence.

According to Dr. Stermensky's psychological evaluation of Natalya in October 2021, Natalya reported being sexually assaulted for 2 years by a stepsibling. She also reported being physically abused by her father and stepmother almost daily from ages 5 to 13, and she never felt nurtured or supported by her parents. Natalya reported a previous suicide attempt at age 11 or 12, and self-mutilating behavior from ages 10 to 13 or 14. She also began having auditory hallucinations at age 14. Natalya reported trying marijuana, cocaine, and alcohol, and said "'alcohol and drug[s] were in my presence a lot in my home and offered to me by my parents.'" Dr. Stermensky diagnosed Natalya with "Major depressive disorder, Single episode, With psychotic features," "Posttraumatic stress disorder," "Unspecified cannabis-related disorder," "Unspecified alcohol-related disorder," and "ADHD per history." Dr. Stermensky recommended, among other things, alcohol and drug education, cognitive and behavioral therapy, medication management, and participation in social and recreational activities that enrich Natalya's life.

Feldman testified that Natalya's diagnoses manifested in physical symptoms including not sleeping, vomiting, panic attacks, cowering to raised voices, and pulling out her hair and eyelashes. Feldman worked on the hair pulling issue with Natalya during therapy and it took until January 2022 for that physical symptom to reduce in frequency. Feldman and Natalya also worked on Natalya's self-esteem and drug education; she "hasn't been smoking cigarettes or pot" as evidenced by "the random UAs that the foster parent does." Natalya was also now attending school and passing all of her classes. According to Feldman, Natalya liked the consistency of having food and shelter in her foster home, things that were not always consistent when she lived with Shane.

To Feldman's knowledge, Natalya had not seen Shane physically "in some time," but had talked to him on the phone. Feldman's concern with Natalya having contact with Shane was that it seemed as though Natalya was "being placed in a situation where she's parenting her parent." For example, when Shane was incarcerated in December 2021, he called Natalya to put money on his books for the commissary. Natalya used money from her part-time job to put money on Shane's books and then told Feldman something to the effect of, "'I know I'll never see that again, the money returned.'" Natalya also told Feldman that every time her cell phone would buzz, she was afraid it was Shane asking for more money.

Feldman diagnosed O'Shea with PTSD, ADHD, oppositional defiance disorder, anxiety, and an unspecified cannabis-related disorder. According to Feldman, O'Shea's marijuana usage occurred when he was in Shane's home. Feldman and O'Shea were working on his behaviors because he had "extreme behaviors at school, some bullying of [younger kids or littler kids]," and they were also working on slowing down, and doing meditation so he could concentrate and get his homework done. O'Shea was now passing all of his classes and attending school daily, his behaviors in school had improved, he was not lying as much, and he was owning up to things he had done. To Feldman's knowledge, O'Shea had not seen Shane since they had a family therapy session in April 2021 and O'Shea "rarely" talked to Shane; "Shane usually calls Natalya because she has the phone." On cross-examination, Feldman stated that O'Shea felt left out because when Shane called Natalya he "[v]ery seldom" asked to speak with O'Shea.

Feldman stated that having "a routine" in the foster home helped support the children's progress. And both children liked the consistency and stability of having food and shelter. When asked if she had concerns about Natalya and O'Shea returning to Shane's home, Feldman responded that Shane needed to have a stable living environment and a job so that he could provide for the children. Feldman was also concerned about the children's mental health if they returned to Shane; she felt their progress would regress. According to Feldman, it would not be in the children's best interests to linger in foster care.

On cross-examination, Feldman testified that Natalya reported first using marijuana at age 7 and alcohol at age 10; she got both from Shane's house. There was no indication that she continued to use marijuana in the foster home as they conduct random UAs, and the foster parents do not have alcohol in their home. O'Shea also reported drug use and said he got marijuana from Natalya. Feldman also testified that O'Shea conveyed being bullied by Shane who would call him names and shove him. According to Feldman, it would be in the children's best interests to be in a drug-free and violence-free home.

Natalya, 16 years old, testified that she and O'Shea were in foster placement with her step-grandmother and her husband, and she felt safe in their home. When asked what she thought

about going home to Shane, Natalya stated that she "would like to go home," "[b]ut, like, what if [Shane] starts using drugs or goes crazy again?" When asked what she meant by going "crazy," Natalya said, "it should be written in the reports," but in the past Shane "tried to say that his girlfriend was poisoning us through the windows with gas" and when the police officer came to the house he said he smelled it but then in the police report he wrote that there was no distinct smell.

Natalya testified that she had contact with Shane via text and Facebook Messenger. She said "it's been good" and Shane "apologized to [her] for a lot of things." However, Natalya had concerns about Shane "coming back and him being on drugs and then, like, trying to pull us all through this case stuff again." Natalya would like to see Shane in the future and maybe go out to dinner, but not go anywhere else. Things might be different if Natalya "knew that he was off drugs and everything else and knew he had a house."

Caseworker Smith testified that pursuant to the DHHS case plan adopted by the juvenile court, Shane was to provide a safe and stable home environment to include food, shelter, security, and to meet the children's educational and medical needs. Shane was also supposed to lead a sober lifestyle free from domestic violence and contact with law enforcement. Smith stated that Shane failed to show up to three or four of the six family team meetings, including the last scheduled meeting in July 2021.

Smith testified that for a majority of the case, Shane never provided DHHS with a physical address, although "there have been different times throughout the case where [Shane] was incarcerated" and during those times Smith was able to meet with him. According to Smith, Shane was jailed on August 5, 2020 (released that same day); from March 12 to 19, 2021 (failure to appear for child abuse charges); April 12 (failure to appear; released that same day); September 20 to October 18 (probation violation, assault, and failure to appear); and again on January 20, 2022, and he had not yet been released when Smith was preparing for the termination hearing. (Shane testified that he was released on March 4.) After Shane's last arrest and incarceration in 2021, he stayed with his eldest daughter, Sierra R. According to Smith, Shane was also found in Sierra's home within the last couple weeks prior to the termination hearing. Smith stated that Sierra's own daughter was removed from her care as a result of a separate juvenile petition and detention order.

April Christensen is a children and family services supervisor with DHHS. According to Christensen, DHHS received a hotline call on March 15, 2022, regarding Sierra's infant daughter because of the conditions of Sierra's home. The hotline worker also discovered that Shane had changed his physical address to Sierra's address on March 9. Two family services specialists went to the home on March 17 and reported that there were no concerns about the condition of the home at that time and they also reported that Sierra indicated Shane did not live in the home but stays there at night and leaves during the day. The DHHS workers found Shane in the back of the home during their walk-through. Sierra and her boyfriend agreed to a hair follicle test for their daughter, which came back positive for methamphetamine on March 22. Sierra's daughter was removed from the home at that time; at the time of removal the condition of the home had also deteriorated. Shane was present at the time of removal and used "cuss words" towards the DHHS workers and law enforcement and claimed that the hair follicle test was not valid or admissible in court. Sierra "mimicked" Shane's behavior and was verbally aggressive to staff. In his testimony, Shane denied

that the infant's methamphetamine exposure was from him; he said he "was not doing drugs at all" and "was fresh out of jail."

Smith testified that Shane never completed a substance use evaluation but did some drug patch testing until June 2021 as noted previously. Smith met with Shane while he was incarcerated in October; Shane agreed that upon his release he would put on a patch and go to treatment, but he did neither, even though he was aware that his visits with the children were contingent on wearing the patch. Smith was unable to contact Shane after his release in October. At the time that Smith transferred the case on January 24, 2022, he was not aware of any place that Shane was living where he could provide for Natalya and O'Shea.

Smith stated that in the current case, Natalya and O'Shea had been out of Shane's home for almost 14 months at the time of the termination hearing, and they were out of his home for 22 months in the previous juvenile case. Between the two juvenile cases, the children only resided with Shane from October 29, 2020, to February 12, 2021, a period of less than 4 months. Since being placed in their foster home, Natalya and O'Shea have developed a sense of security and both expressed that they felt loved. The children also had improved attendance and behaviors at school and were able to have friends and interact socially. Smith opined that it was in the best interests of the children "to be adopted" by their foster parents.

Amanda Leighton testified that she took over the case from Smith in January 2022 and was the children's current case manager. Leighton met with Shane twice. Her first contact with Shane was in February at a detention center. At that meeting, Leighton reminded Shane that he would need to comply with the court ordered patch to have visitation after he was released, but he did not want to do that. Leighton met with Shane again on March 15 and he asked about visitation, but she told him that he had to comply with the court order for a drug patch. She said Shane asked, "'If I relinquish, can I see my kids?'" Leighton told Shane that she does not trade relinquishment for visitation and that they still had to comply with the court order, but Shane said that he was not going to do that. Leighton opined that it was in the children's best interest "for termination to occur" so that they could "achieve permanency and stability through adoption."

Shane testified that he had in-person visitation with Natalya and O'Shea until approximately July 2021, and it went "pretty well." He said they were able to do things together like go to the park or the mall. When asked what parenting skills he exhibited during his visits, Shane said that he helped the children with their homework and disciplined them for things like fighting with each other. According to Shane, there were a couple of negative visits when he and the visitation worker thought Natalya was under the influence of drugs. When asked if he ever had to be awakened during a visit, Shane indicated there was one week that he may have been awakened twice because he had been up since 4:30 a.m. for work. Visits stopped after he missed a court date and had a warrant out for his arrest. Shane said he tried to get visits started again but it "didn't happen." However, he had since done video visits and Facebook Messenger and wrote letters and had maintained contact with the children.

Shane denied ever seeing Natalya pulling out her hair or that she reported having anxiety when he had custody of the children. He also denied that he condoned the children's use of alcohol and marijuana in his care and did not believe they did so, but then later said he "called Sierra in for drinking and drug use" and tried to get help from the State with that when she was younger; he

said the State "didn't help me out." Shane did have concerns about the children missing school and said Natalya had her sister call her out of school without his knowledge.

Shane reported that he was self-employed as a "boiler mechanical engineer." He could not remember all of the addresses he resided at during this case, but said he was in the process of being evicted when the children were removed, he stayed at a "Welcome Inn" for 3 or 4 months, then was at a friend's house "North of town," and also resided "at Sierra's" from October 2021 to January 2022, and again in March. He was currently incarcerated.

Shane testified that he tried to get a substance abuse evaluation done with Feldman but there was "a conflict of interest" and she was going to recommend someone else. When asked if that was ever done, Shane replied, "No." Feldman testified that in April 2021, Shane was in her office for a family session with Natalya and O'Shea. At that time, Shane told Feldman that he needed to have a drug and alcohol evaluation done to work on reunification. Feldman later messaged him and let him know that there was an open appointment on May 5 with another provider in her office. On May 5 Shane apologized for missing the appointment and asked if there was a way to reschedule. The next day Feldman asked if May 14 would work, but she never heard back from Shane; Shane never attempted to reach out after that.

Shane stated that he completed a substance abuse evaluation "with the jail" "[m]onths ago." When asked if he recalled what the recommendations of the evaluation were, Shane responded, "Pretty much no treatment at all," "I haven't used drugs in quite some time." On cross-examination Shane said that he did not tell his caseworker that he had a substance abuse evaluation done in jail until he saw her in March 2022, and she told him they "would talk about [a] release." Shane said that they did talk about getting him on patches, but "she denied me patches and visits" and said they would only do therapeutic visits. He denied ever telling Leighton that he would not put on a patch. He said that he agreed to the patches at both his February and March meetings with Leighton.

Shane wanted to be reunified with Natalya and O'Shea and did not want his parental rights terminated. He believed he could provide the children with a stable environment and provide for their needs.

On cross-examination Shane acknowledged that he had been in and out of jail for the last 6 months. He had a pending case for felony child abuse and a pending case for possession of methamphetamine. He was also currently in jail on charges of "[c]onspiracy to commit theft and a theft by receiving." When asked if he felt like he had completed his case plan goals in order to have the children returned to him, Shane replied, "No, not exactly." He said he did not have a stable place to live and was not currently working, but that he "really [had not] had the chance to do anything like that."

Sierra, 20 years old, testified that her father, Shane, stayed with her off and on since October 2021. She said Shane "wasn't really there much of October," but when she had her baby in November, he "was fully there" until he went to jail in January 2022. He also stayed with her for a few weeks in March after he was released from jail. Sierra had seen Shane actively care for her younger siblings. Sierra had also seen Shane actively care for her baby and "felt comfortable having her with him because . . . he's got four kids and he's raised all of us without any issues." When Sierra and her siblings were living with Shane, they had a house, food, and clothing, and Natalya and O'Shea went to school. Sierra did not have any safety concerns or concerns about

Shane's parenting skills. She heard that Shane had problems with methamphetamine through the years, but she had not personally seen him use and did not believe he had a drug problem because "he can stop when he wants to." Sierra would like to see Shane's relationship with Natalya and O'Shea continue.

JUVENILE COURT'S DECISION

In a journal entry and order entered on May 25, 2022, the juvenile court found by clear and convincing evidence that statutory grounds for termination of Shane's parental rights existed pursuant to § 43-292(2), (4), (6), and (7); however, the court found that § 43-292(1) (abandonment) had not been proven by clear and convincing evidence. The court also found that Shane was an unfit parent and that termination of his parental rights was in the children's best interests. Accordingly, the court terminated Shane's parental rights to Natalya and O'Shea.

Shane appeals.

ASSIGNMENTS OF ERROR

Shane assigns that the juvenile court erred in finding that (1) statutory grounds existed to terminate his parental rights, and (2) termination of his parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

STATUTORY GROUNDS FOR TERMINATION

The GAL sought to terminate Shane's parental rights to Natalya and O'Shea under § 43-292(1), (2), (4), (6), and (7). The juvenile court found that four of those grounds, § 43-292(2), (4), (6), and (7), existed by clear and convincing evidence.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

Natalya and O'Shea were removed from Shane's care from December 2018 to October 29, 2020, in the previous juvenile court case. They were then returned to Shane until February 12, 2021, when they were removed from him in the current case. The children remained out of home through at least April 15, 2022, when the second day of the termination hearing was held. At the

time of the termination hearing, the children had been in an out-of-home placement for more than 18 months of the most recent 22 months. In fact, they had been in an out-of-home placement for more than 35 months of the most recent 39 months. This clearly and convincingly satisfies the 15-out-of-22 months period.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating the parental rights of Shane. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*. We next consider whether termination is in the children's best interests.

### BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, this is the second time that Natalya and O'Shea have been removed from Shane's care; and this second removal occurred less than 4 months after the children were returned to Shane at the conclusion of the previous juvenile case. The current removal was due to concerns of Shane's drug use and neglect of the children. Shane complied with drug patch testing until June 2021, but all 7 patches were positive for amphetamines and methamphetamines. He refused to use patches after June, despite knowing that it was a condition of visitation. He claims to have completed a substance abuse evaluation while in jail but had not signed a release for DHHS to obtain the evaluation. He had multiple incarcerations throughout this case and was incarcerated at the time of the termination hearing and he did not have safe and stable housing for the children.

According to Feldman, it would be in the children's best interests to be in a drug-free and violence-free home and it would not be in their best interests to linger in foster care. Smith opined that it was in the best interests of the children "to be adopted" by their foster parents. And Leighton opined that it was in the children's best interest "for termination to occur" so that they could "achieve permanency and stability through adoption." We agree that the children need permanency and stability which Shane has been unwilling or unable to provide.

Natalya and O'Shea had been out of Shane's care for more than 35 months of the most recent 39 months at the time the termination hearing concluded. "Children cannot, and should not,

- 10 -

be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The State proved that Shane was unfit, meaning that he has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in Natalya's and O'Shea's best interests to terminate Shane's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the orders of the juvenile court terminating Shane's parental rights to Natalya and O'Shea.

AFFIRMED.